IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CONO CORPORATION,

                Plaintiff-Counterdefendant,              OPINION AND ORDER

    v.

                                       24-cv-703-wmc

DR. SHEILA SCHILS, and
EQUINEW THERAPY, LLC,

                Defendants-Counterclaimants.

---

This case ostensibly arises out of a dispute over access to several thousand horse treatment records, called "therapy cards," which are owned by defendant EquiNew Therapy, LLC ("Therapy LLC"), but really turns on a failure by the parties to work cooperatively to develop the technology sold by defendant Dr. Sheila Schils in a stock purchase agreement.   Generally, plaintiff Cono Corporation ("Cono") argues that defendants Therapy LLC and Dr. Schils breached their contractual agreements by refusing to grant it access to unredacted therapy cards, while defendants counterclaim for breach of contract by virtue of Cono allegedly withholding promised payments and technology. Defendants have moved for summary judgment on all of plaintiff's claims and as to the first of their counterclaims.  (Dkt. #17.)[1]  The court agrees that: (1) defendants did not breach any obligation to provide plaintiff with the unredacted therapy records under the plain terms of the Service Agreement and the undisputed record on summary judgment;

---

[1] Plaintiff also moved for leave to file a sur-reply.  (Dkt. #30.)  Given the breadth of the briefing and narrowness of the sur-reply, plaintiff's motion is granted and the court has considered the sur-reply in deciding summary judgment.

and (2) plaintiff breached the contract by withholding certain payments and technology from defendants. As fully explained below, therefore, the court grants defendants' motions in full, although a trial is still required as to defendants' counterclaims to determine damages for Count I, and the merits of Counts II-III alleging breach of the Membership Interest Purchase Agreement and entitlement to promissory estoppel.

## UNDISPUTED FACTS[2]

### A. Dr. Schils' Background and Practice

Dr. Sheila Schils is a horse rehabilitation and treatment specialist who lives in River Falls, Wisconsin. (Schils Decl. (dkt. #20) ¶ 1.) Dr. Schils founded and previously owned 100% of the shares in Wisconsin limited liability company, EquiNew, LLC ("EquiNew"), before selling those shares to plaintiff Cono in June of 2024.[3] (Pl.'s Resp. to Def.'s Proposed Findings of Fact ("PFOF") (dkt. #24) ¶ 1.) EquiNew designs, produces, and sells "Functional Electrical Stimulation" ("FES") equipment, used by equine health practitioners to rehabilitate and treat injured horses. (*Id.* ¶¶ 3-4.) While EquiNew trains practitioners on how to use the FES equipment, EquiNew has never treated horses directly. (*Id.* ¶¶ 4-5.)

Dr. Schils continues to own and operate a separate Wisconsin limited liability company, defendant Therapy, LLC, through which she runs a private equine therapy

---

[2] Unless otherwise noted, the court finds the following facts undisputed for the purposes of summary judgment. The facts are drawn from the parties' proposed findings of fact and responses, as well as the underlying evidentiary record where appropriate.

[3] EquiNew is not itself named as a party in suit.

practice that treats and rehabilitates horses both in the United States and abroad. (*Id.* ¶¶ 6-7, 9.) With horse owners' consent, Therapy LLC and Dr. Schils administer treatment, including with FES technology developed and owned by EquiNew, creating and maintaining predominantly handwritten treatment records throughout the process -- the so-called "therapy cards." (*Id*. ¶¶ 54-60.) These cards include confidential and sensitive information, including the names and contact information of the horse's owners and trainers, as well as the horse's specific injury and treatment history using FES technology. (*Id.* ¶ 60.) In her private practice, Dr. Schils uses the FES technology and records data about FES treatments on those cards. (*See, e.g.,* Dkt. #23-2, at 5.) Over several years of practice, Dr. Schils has generated thousands of therapy cards as she has treated horses using FES technology. (PFOF (dkt. #24) ¶¶ 58-59.)

### B. Proposed Sale of EquiNew

After spending 17 years developing FES technology for EquiNew, Dr. Schils was considering selling the company to focus predominantly on her own, private therapy practice. (*Id.* ¶¶ 10-11.) In December 2023, therefore, she contacted and hired Tony Loiacono as a consultant to find a potential buyer for EquiNew. (*Id.* ¶ 12.) After Dr. Schils rejected two other, independent offers, Loiacono himself and his business partners -- operating through plaintiff -- proposed to purchase EquiNew from Dr. Schils in April 2024.

(*Id.* ¶ 28.)[4]  Agreeing to their initial proposal, Cono then provided her with a Letter of Intent of purchase.  (*Id.* ¶¶ 28-29.)  Cono is a Florida corporation, whose principal owners are Tony Loiacono, Michael Mareschal, Ed Lorentz, and Bill McBride.  (Loiacono Decl. (dkt. #23) ¶ 1; PFOF (dkt. #24) ¶ 28.)  During negotiations for the sale of EquiNew, Dr. Schils disclosed to Cono that she had a separate, private horse therapy practice, Therapy LLC, under which she intended to continue to treat horses after the sale of EquiNew. (PFOF (dkt. #24) ¶¶ 30-31.)

Shortly after receiving Cono's letter of intent, Dr. Schils shared a memo with Loiacono that discussed possible improvements for future versions of the FES technology -- titled, "FES 310 Upgrade Ideas."  (Dkt. #23-2, at 1-2.)  In addition to including many technical specifications, that memo also discussed the possibility of adding a software feature to the next version of FES devices which could collect and store data while the system is in use.  (*Id.*, at 4.)  More specifically, the memo stated:

> It would be valuable for the user to input the type of movement observed during the treatments by being able to add words such as those listed below ["mild, moderate, deep, etc."]. The user could choose from the list during the treatment by clicking on the term. The term would need to be associated with a specific time and voltage. For example, when the time is at 10 minutes and the voltage is 7.8 and the conductivity is 333 the practitioner would add the term "mild". ... Then all this data would ... be stored under the horse's name on the iPad. **I will attach a picture of my current data storage method so you can see what I am doing.** I use an iPen and an iPad and then this is how I also bill out for the work. Veterinarians need to have a means to keep track of their work for billings as well so I think they would love this option to store the data for multiple reasons.

---

[4] The parties include certain proposed facts concerning how Loiacono transitioned from brokering a sale of Equinew to becoming one of its buyers, including the suggestion that he disclosed certain confidential information about the company to his business partners prematurely.  However, no claims have been asserted with respect to this alleged conduct, nor does it impact the court's decision on summary judgment.

(*Id.* (emphasis added).)  Attached at the end of the memo itself was the stated example of a therapy card, which the court bolded above.  (*Id.*, at 5.)  Other than this example card referenced in the above-quoted passage, Dr. Schils' memo does not reference incorporating her historical therapy data in future versions of the FES technology.  (*Id.*)

Later in April, Dr. Schils re-sent the same memo to Loiacono, adding in her cover email that:  "At the end is the document that is how I take my notes. This document should also answer some questions you have about how the data is collected and used."  (Dkt. #23-1, at 2.)  Loiacono responded to that email, asking, "How many cards like this do you have?", to which Schils responded, "Thousands…" (*Id.* at 4.)  Loiacono then forwarded that email chain to his business partners (although *not* to Dr. Schils), commenting that "this is gold."  (*Id.*)  Even later,  Loiacono noted for his business partners alone that:

> The card referenced in the attachment provides Dr. Sheila Schils['] typical hand written Horse/Owner ID & Treatment card. This is currently being hand done, [and EquiNew's contracted engineer] had agreed he would continue with this approach during early pilot. Importantly, our job will be to make a simple web/app interface with data desired.

(*Id.*, at 1.)  Dr. Schils was not copied on either of the follow-up emails from Loiacono to his business partners, nor their responses.  (*Id.*, at 1-4.)

## C.  Sale of EquiNew to Cono

On June 1, 2024, Cono formally purchased EquiNew under the terms of a written Purchase Agreement executed by both Cono and Schils.  (PFOF (dkt. #24) ¶¶ 11, 35, 37.) The Purchase Agreement specified that, at the time of closing, Schils was to deliver an assignment of all membership interests in EquiNew to Cono, a Non-Competition

Agreement, and any other documents necessary to transfer all membership interests to Cono. (Dkt. #6-1, at § 2.2.) The Purchase Agreement also specified that Cono and Therapy LLC would execute a separate Consulting and Services Agreement ("Services Agreement"). (Dkt. #6-1, at §§ 2.2, 5.4.) At the time of purchase, the parties also agreed that EquiNew held *no* physical assets, since a contractor manufactured all the FES equipment. (PFOF (dkt. #24) ¶¶ 32-33.) The Purchase Agreement further specified that "it shall not be considered competition with Buyer, and/or Company for Seller, whether in her individual capacity or as a member or employee of an entity, to . . . continue to be engaged in the private clinical practice of animal therapy." (Dkt. #6-1, at § 5.3.) Nor did the Purchase Agreement reference therapy cards. (*Id.*) Finally, the Purchase Agreement indicated that it superseded any prior representations with respect to Cono's purchase of EquiNew. (*Id.*, at § 14.)

As specified in the Purchase Agreement, Cono also contracted Therapy LLC for future consulting work in the Services Agreement. (Dkt. #6-2; PFOF (dkt. #24) ¶ 40.) Under that agreement, Therapy LLC was to receive a Consulting Fee of $500,000.00 payable in monthly installments over sixty months, "deemed earned" at closing, along with a defined percentage of future revenue. (Dkt. #6-2, at §§ 3.1-3.3; PFOF (dkt. #24) ¶ 40.) Cono also agreed to provide Therapy LLC with four FES systems for use in Therapy LLC's private therapy practice. (Dkt. #6-2, at § 4.2; PFOF (dkt. #24) ¶ 46.) Dr. Schils was not herself a named party to the Services Agreement. (Dkt. #6-2, at 1; PFOF (dkt. #24) ¶ 40.) Like the Purchase Agreement, the Services Agreement stated that the contract represented the parties' final agreement, superseding any prior understandings or agreements about

consulting services to be provided by Therapy LLC to Cono.  (Dkt. #6-2, at § 18.)

More specifically, Therapy LLC agreed to provide to EquiNew: "consulting services relating to the management and operation of the Business, consulting services related to Functional Electrical Stimulation technology generally, and other services related to expanding the Business into new markets on behalf of Corporation."  (*Id.*, at § C.)  The scope of Therapy LLC's consulting services is further defined in the agreement as follows:

> Consultant shall … provide consultation to Corporation, as described in this Section 1, regarding the management and operation of the Business, including marketing, customer service, customer relations, sales assistance, analysis of accounting reports, trend data, and other significant operating ratios, upon request and reasonable prior notice by Corporation. Consultant shall also provide consultation to Corporation regarding the electrotherapy industry in general if Corporation so requests. The above-referenced consulting services (collectively, "Services") shall include, but not be limited to, consultation to the Business relating to parts and services, information systems, risk management, financial services management, financial management, and industry and client education and research.

(*Id.*, at § 1.1.)

The Services Agreement also identified that Cono "is and will be the sole and exclusive owner of . . . all the results and proceeds of the Services performed under this Agreement, including any work prepared, produced, authored, edited, or modified in the course of performing the Services (collectively, "Work Product")."  (*Id.*, at § 5.1.)  Therapy LLC also agreed to license its pre-existing materials to EquiNew if the materials were necessary to use any Work Product:

> Notwithstanding Section 5.1, to the extent that any of Consultant's pre-existing materials are incorporated in or combined with any **deliverable or otherwise necessary for the use or exploitation of any Work Product, Consultant hereby grants to Corporation** . . . **license** to use, publish, reproduce, perform, display, distribute, modify, prepare derivative works based upon, make, have made, sell, offer to sell, import, and otherwise exploit

7

such preexisting materials and derivative works thereof.

(*Id.*, at § 5.5 (emphasis added).)

Separately, the Services Agreement explicitly acknowledged that Dr. Schils' "engagement, directly or indirectly, in the private clinical practice in animal therapy does not compete with Corporation's Business."  (*Id.*, at § 10; PFOF (dkt. #24) ¶ 45.)  The parties further agreed that both the Purchase Agreement and the Service Agreement "reflect the parties' mutual understanding that Dr. Schils would continue to provide treatment services to horses post-closing through Therapy LLC."  (PFOF (dkt. #24) ¶ 43.)

### D. The Parties' Dispute over the Therapy Cards and FES equipment

Since the parties entered the agreement, Dr. Schils has continued to treat horses under her Therapy LLC practice and to create and maintain therapy cards while directly treating horses.  (Dkt. #28, ¶ 78.)  Immediately pre- and post-closing, the record also shows that the parties met and discussed planned improvements to the FES systems, based predominantly on Dr. Schils' previously provided memo for contemporaneous data collection.  (Dkt. #23-3, at 2-6.)  Like the memo itself, those meeting notes show that the parties discussed technical specifications for a data capture feature on a future version of the FES device.  (*Id.*)

Shortly after these discussions, however, the parties' relationship began to deteriorate, including disputes over pre-closing sales revenue, the transfer of EquiNew's bank accounts, and the status of the therapy cards.  (PFOF (dkt. #24) ¶¶ 48-52.)  Relevant to the therapy card dispute in particular, at some point either before or after the acquisition, described as "mid-2024" by Loiacono, Cono Corporation generated an

undated, internal presentation showing the planned use of therapy cards to develop an app in conjunction with a developer called NewCo.  (Loiacono Decl. (dkt. #23) ¶ 7; Dkt. #23-2, at 6.)  The presentation itself states that: "Note: Developed w/ Dr. Schils['] knowledge since April 2024 with comprehensive writ[ten], zoom and verbal communication by NEWCO."  (Dkt. #23-2, at 6.)  Cono does not provide any record evidence that this presentation specifically was sent to Dr. Schils or otherwise shared with her.  (Dkt. #23-2, at 6-7.)  Nonetheless, Loiacono testified that: "Dr. Schils was aware of and involved in … discussions [to use the therapy card data to develop an app] – indeed, the plan was predicated on incorporating her experience and data."  (Loiacono Decl. (dkt. #23) ¶ 7.)

On the other hand, Dr. Schils maintains that, from the beginning of negotiations for the purchase of EquiNew until late August, 2024, she was unaware that Cono planned to either purchase or use therapy card data.  (Schils Decl. (dkt. #29) ¶¶ 5-7.)  Specifically, she testifies that Cono first asserted any expectation for her to transfer all her therapy cards to it during an August 2024 Zoom meeting, at least two months after closing.  (Schils Decl. (dkt. #20) ¶ 28.)  In this meeting, Ed Lorentz, one of Cono's owners, told Dr. Schils on behalf of Cono that they would accept the therapy cards with the confidential information identifying the horse and the owner redacted.  (Dkt. #29-2, at 4; PFOF (dkt. #24) ¶¶ 64-65.)  Later, Cono changed course, however, stating it would only accept fully unredacted therapy cards, because Cono wanted the data to include a Horse ID so that they could track any given horse's improvement over time.  (PFOF (dkt. #24) ¶ 66; Loiacono Decl. (dkt. #23) ¶ 12.)  Given the sensitive nature of the information on the therapy cards, Dr. Schils refused to provide them unredacted.  (PFOF (dkt. #24) ¶ 62.)

Up until this point, Therapy LLC had billed 281 hours of consulting services to Cono.  (Dkt. #28, ¶78.)  However, when Dr. Schils refused to send unredacted therapy cards, Cono ceased paying Therapy LLC under the Services Agreement, and she subsequently ceased consulting for them.  (Loiacono Decl. (dkt. #23) ¶ 14.)  As a result, Cono has not paid Therapy LLC the monthly portion of its consulting fee after October 2024, nor the post-closing prorated Revenue Share for the year 2024, which the parties agree was $14,583.33.  (*Id.*; PFOF (dkt. #24) ¶ 92.)

For the services that she did provide as a consultant under Therapy LLC, Dr. Schils reports she did not directly treat horses, nor did she create any materials for which the therapy cards would be necessary to use.  (Schils Decl. (dkt. #20) ¶¶ 37-40.)  For his part, Loiacono testified that: "The Therapy Cards data are, in fact, necessary to exploit the 'trend data' analysis and expansion initiatives that were a core part of Dr. Schils' consulting duties. It was understood on both sides that Cono would need access to those historical therapy records to perform meaningful trend analysis and drive EquiNew's growth." (Loiacono Decl. (dkt. #23) ¶ 8.)

Finally, Cono and EquiNew have not provided Therapy LLC with the four FES units specified in the Services Agreement.  (Dkt. #28, ¶ 78.)  Cono represents that it did not provide the units because about 17 FES systems were present at the manufacturer, and that Cono requested a reconciliation of FES inventory from Dr. Schils in a demand letter before release.  (Loiacono Decl. (dkt. #23) ¶ 14.)  However, Dr. Schils responds that Cono retains complete control over the FES equipment inventory records, and she does not have access to the FES equipment inventory records; meaning she is unsure as to the reason for

any confusion and cannot provide assistance outside offering to contact the manufacturer. (Schils Decl. (dkt. #29) ¶ 14.)

## OPINION

The court grants summary judgment when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial responsibility of showing the court that there is no genuine issue of material fact demonstrated by the non-moving party on the record.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, the nonmoving party must point to "specific facts showing a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "A mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be evidence from which a jury could reasonably find for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.  If the moving party shows that, on the essential elements of its case, no reasonable jury could find for the nonmoving party, then it is entitled to summary judgment as a matter of law.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009).

## I. Therapy LLC's Alleged Obligation to Provide the Therapy Cards under the Services Agreement (Count II)

As specified in the Services Agreement, disputes under the contracts at issue are governed by Florida law.  (Dkt. #6-2, § 19.)   In Florida, "contract interpretation is a question of law to be decided by the court by reading the words of a contract in the context of the entire contract and construing the contract to effectuate the parties' intent."  *Feaz v. Wells Fargo Bank, N.A.*, 745 F.2d 1098, 1104 (11th Cir. 2014).  Where the parties' dispute their intent at the time they entered into the contract, "the plain language of the contract is the best evidence of the parties' intention."  *Golden v. Univ. of Miami*, 484 F. Supp. 3d 1255, 1262 (S.D. Fla. 2020) (quoting *Handi-Van, Inc. v. Broward Cty., Fla.*, 2010 WL 1223776, at *5 (S.D. Fla. Mar. 29, 2010)).

Whether contractual language is ambiguous is a question of law.  *Id.*  Ambiguity exists only where the contract language is susceptible to two different, reasonable interpretations.  *Seritage SRC Fin., LLC v. Town Ctr. at Boca Raton Tr.*, 397 So. 3d 44, 46–47 (Fla. Dist. Ct. App. 2024).  A particular contract interpretation "is not reasonable if it requires rewriting the contract to add language that a party omitted and in order to impose an obligation on the other party that was not in the original bargain."  *Golden,* 484 F. Supp. 3d at 1262 (quoting *Ferreira v. Home Depot/Sedgwick CMS,* 12 So. 3d 866, 868 (Fla. 1st DCA 2009)).  As such, "where a contract is silent as to a particular matter, courts should not, under the guise of construction, impose on parties contractual rights and duties which they themselves omitted."  *Id.* (quoting *BMW of N. Am., Inc. v. Krathen*, 471 So. 2d 585, 587 (Fla. 4th DCA 1985)).  The parties are bound by the unambiguous terms of their contract.  *Chrysler Realty Corp. v. Davis*, 877 So. 2d 903, 906 (Fla. Dist. Ct. App. 2004).

Thus, unless the contract is ambiguous, extrinsic evidence of the parties' subjective understanding is not consulted.  *Feaz*, 745 F.3d at 1104.

In this case, the parties ask the court to determine whether the Services Agreement obligated Therapy LLC to give its therapy card data to plaintiff.  The only provisions of that agreement under which plaintiff could plausibly expect Therapy LLC to transfer or license its therapy cards are:  (1) Section 5.1, which states that Cono owns all Work Product created pursuant to Therapy LLC's services under the agreement; *or* (2) Section 5.5, which requires Therapy LLC to license any pre-existing materials necessary to use any Work Product generated under the agreement.  The court addresses each clause in turn to determine whether the agreement obligated Therapy LLC to transfer the cards or all information on the cards to plaintiff as a matter of law given the undisputed facts.

### A.  Section 5.1

Section 5.1 of the Agreement states that Cono "is and will be the sole and exclusive owner of . . . all the results and proceeds of the Services performed under this Agreement, including any work prepared, produced, authored, edited, or modified in the course of performing the Services (collectively, "Work Product")."  (Dkt. #6-2, at § 5.1.)  The Services are fully described in Section 1.1 and include: "consultation to the Business relating to parts and services, information systems, risk management, financial services management, financial management, and industry and client education and research." (*Id.*, at § 1.1.)

Defendants argue that no evidence in the record supports a finding that Dr. Schils created therapy cards as part of these defined Services because:  (1) Cono admits that the

13

entire process through which therapy cards are created is under the auspices of Therapy LLC's private therapy practice, during which Dr. Schils directly treats horses; (2) the Services that Therapy LLC was to provide under the Services Agreement does *not* include directly treating horses; (3) Cono admits that it never asked Dr. Schils to treat horses under the Services Agreement, nor does EquiNew treat horses as part of its business; and (4) the agreement expressly contemplates in the non-competition provision that Dr. Schils will continue privately treating horses, *separately* from her provision of Services to Cono.

In response, plaintiff does not actually address how, if at all, Section 5.1 entitles it to historical information in the therapy cards, but rather just cites that section several times in its brief, asserting without explaining why its language in any way obligates Therapy LLC to transfer the cards under this provision. Such an undeveloped argument is no argument at all, and plaintiff has effectively waived it at least as to this provision. *See Savory v. Cannon*, 2024 WL 4786167, at *9 (C.D. Ill. 2024) (citing *Laborers Int'l Union v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 2003)) ("A party opposing summary judgment waives any argument not raised in his responding brief.").

Even if plaintiff had not waived this argument, the undisputed facts in the record demonstrate that defendants are entitled to summary judgment as a matter of law, since Section 5.1 is unambiguous: Cono owns any Work Product generated by Therapy LLC pursuant to the Services that Therapy LLC was to provide under the Agreement only. Directly treating horses, and thus producing the therapy cards for individual horses, is not part of the definition of Services in the Agreement. Instead, it was expressly contemplated by the Services Agreement to be a separate practice that Therapy LLC was to maintain.

14

Moreover, even the contemporaneous creation of those records while using the technology itself was only a theoretical possibility at the time of EquiNew's purchase by plaintiff.

Construing the pleadings and record most generously to the nonmoving party, plaintiff haphazardly argues that the analysis of "trend data" as part of Dr. Shils' work under the Services Agreement would have required Therapy LLC to produce therapy cards for analysis by Cono and ensure that they were then transferred to Cono as 'Work Product' under section 5.1. However, reading the whole definition of "Services" to be provided, the work of Therapy LLC, including Dr. Shils' work, is defined as: "consultation … regarding the management and operation of the Business, including marketing, customer service, customer relations, sales assistance, analysis of accounting reports, trend data, [etc.]," but does not include direct treatment of horses. (Dkt. #6-2, at § 1.1.); *Golden*, 484 F. Supp. 3d at 1255 ("Contract interpretation is a question of law to be decided by the court by reading the words of a contract *in the context of the entire contract.*") (emphasis added).

Thus, interpreting individualized historic horse therapy cards as Work Product generated by the business-oriented consulting that Services Therapy LLC was to provide under the agreement is not a *reasonable* interpretation of the contract language, particularly in light of: (1) the clauses in the agreement contemplating Dr. Schils' continued, separate private practice treating horses; (2) the fact that EquiNew has not and does not provide direct treatment services to horses; and (3) Cono's admissions that the therapy cards are created in the process of directly treating horses. *Ferreira*, 12 So. 3d at 868 ("An interpretation is not reasonable if it requires rewriting the contract to add language that a party omitted … in order to impose an obligation on the other party that was not in the

original bargain"). Thus, the parties are bound by the unambiguous contract language, and any therapy cards generated by Therapy LLC after it entered into the Services Agreement with Cono cannot be considered Work Product under Section 5.1 as written, unless following under the exception in Section 5.5. *Chrysler*, 877 So. 2d at 906.

Finally, and perhaps most importantly, plaintiff has failed to show any *material* breach under the Services Agreement by defendants under Section 5.1, since it is undisputed that they offered to provide the therapy cards redacted only to preserve the confidentiality of the individual horse and its owner. As there is no genuine dispute of material fact in the record on this point, defendants are entitled to summary judgment as a matter of law.

### B. Section 5.5

Defendants similarly argue that they are entitled to summary judgment as a matter of law that Section 5.5 of the Services Agreement did not require Therapy LLC to license its therapy card data to plaintiff. Instead, Section 5.5 merely provides: "to the extent that any of Consultant's pre-existing materials are incorporated in or combined with any deliverable or otherwise necessary for the use or exploitation of any Work Product, Consultant hereby grants to Corporation" a license to use the pre-existing materials. (Dkt. #6-2, at at § 5.1.) Defendants first argue that plaintiff *waived* any claim of breach of Section 5.5 by failing to even allege such a breach in its complaint. Defendants further argue that plaintiff fails to identify any deliverable or Work Product that Therapy LLC generated while providing work under the Services Agreement in which therapy data was incorporated or for which the therapy data is necessary to use. Thus, they argue, there is

no genuine dispute of material fact that under the Agreement, Therapy LLC was not obligated to license its therapy card data to plaintiff.

Plaintiff responds that it properly claimed in its complaint that Therapy LLC breached Section 5.5.  Assuming that the allegation was properly raised, plaintiff's argument that it is entitled to the therapy cards under Section 5.5 of the agreement nonetheless fails as a matter of law.  To begin, plaintiff argues that the therapy cards were necessary for the use or exploitation of Dr. Schils' "trend analysis" to be performed as part of her consulting under the Services Agreement.  In support of this assertion, plaintiff points to the memo that Dr. Schils emailed to Cono in April 2024, discussing the possibility of a next version of FES technology, as well as Cono's subsequent emails about that memo.  Even if the memo and Dr. Schils' emails explicitly referenced a plan to use all of Therapy LLC's therapy card data to develop future versions of the FES technology -- and, on their face, they do not -- none of these materials could possibly be considered Work Product generated by Therapy LLC under the Services Agreement, because they were all generated *before* the parties entered into that agreement on June 1, 2024.

Additionally, plaintiff relies on notes of discussions that occurred just before and after closing allegedly showing that Cono is entitled to the therapy cards under Section 5.5.  Like the memo and Dr. Schils' emails, however, the discussion notes did not reference a plan to use Therapy LLC's therapy card data to develop future versions of the FES technology.  And to the extent that the notes *could* be considered ongoing Work Product generated as a result of Therapy LLC's performance under the agreement, plaintiff makes no showing that several years' worth of therapy card data is incorporated into the notes,

or necessary to exploit or use the meeting notes themselves. Thus, again, plaintiff proffered no material fact that Section 5.5 allows plaintiff to demand the therapy cards based on the meeting notes alone.

Finally, plaintiff argues that its undated internal presentation, which discusses plans to develop an app that incorporated therapy card data, required Therapy LLC to license the therapy cards to plaintiff under Section 5.5. First, the presentation was plaintiff's internal strategic planning document that Loiacono helped prepare. (Loiacono Decl. (dkt. #23) ¶¶ 2(b), 7.) Thus, even if Dr. Schils knew about this presentation and the plan (which she disputes), and the presentation was generated after the parties entered into the Services Agreement (which is not apparent from the record), the presentation itself is *not* Therapy LLC's Work Product; Therapy LLC did not produce it while performing Services under the Agreement. Rather, it is *plaintiff's* own, internal plan. Therefore, the document cannot form the basis to require Therapy LLC to license its therapy cards to plaintiff under Section 5.5. Finally, even if the document could be considered Therapy LLC's Work Product, plaintiff makes no showing that Therapy LLC's entire cache of treatment records is incorporated in, or necessary to use, the planning document itself.

In summary, whether it was truly plaintiff's unilateral understanding that it would be entitled to use all of Therapy LLC's unredacted therapy cards, and whether Dr. Schils knew of this, there is *no* dispute of material fact as to this claim because plaintiff fails to identify any "Work Product" generated by Therapy LLC under the Services Agreement that would require Therapy LLC to license its therapy cards to plaintiff at all, much less in their fully unredacted form, under Section 5.5 of the contract. At most, the plain language

of the Services Agreement shows the parties' intentions when they entered the contract, and the court may not "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties" when it is asked to interpret the contract. *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1138 (Fla. 1998). Again, most importantly, the undisputed evidence is that defendants went above and beyond the Services Agreement's express terms by offering access to redacted versions of its private therapy cards in good faith, which plaintiff declined. Thus, there was no breach of contract by defendants, and they are entitled to summary judgment as a matter of law on this claim.

To be clear, this does *not* mean that defendants may not still have an obligation to incorporate pre-existing therapy card information as "necessary for the use or exploitation of" any app or treatment protocols that might be developed under the Service Agreement in the future, and if so, perhaps even to license their use. However, plaintiff has offered no facts permitting an inference that defendants were even *asked* to develop such a product under the Services Agreement, much less that they did so. To the contrary, plaintiff concedes that it merely directed defendants to turn over the raw data for a different, third party to use as it saw fit to develop those products, rather than asking defendants to do so.

## II. Plaintiff's Remaining Claims (Counts I, III-V)

Defendants have also moved for summary judgment on plaintiff's remaining claims, which the court briefly addresses below, finding for defendants on each count as a matter of law.

**A. Dr. Schil's Alleged Obligation to Provide the Therapy Cards under the Purchase Agreement (Count I)**

In Count I, plaintiff argues that, under the Purchase Agreement, Dr. Schils was individually liable for failure to ensure that Therapy LLC effectuated the Services Agreement. Regardless of the merits of this proposition, because the court finds that Therapy LLC did *not* have a contractual obligation to transfer unredacted and unfettered pre-existing therapy cards to Cono under the terms of the Services Agreement, defendants are entitled to summary judgment as a matter of law on this claim.

**B. Unjust Enrichment (Count IV)**

Plaintiff claims that it is alternatively entitled to relief under an unjust enrichment theory, because "defendants have been unjustly enriched by receiving the benefits of the Purchase Agreement and the Services Agreement without performing their corresponding obligations, including transferring the Cards and other intellectual property to the Company." (Pl.'s Compl. (dkt. #6) ¶¶ 32-34.)  Plaintiff explains in its briefing that the benefits it alleges that Therapy LLC is unjustly retaining are the payments under the Services Agreement and its therapy cards.  Plaintiff also argues that the claim should survive summary judgment as an alternative claim for relief should the court find the Services Agreement void or unenforceable.

However, as defendants note, under Florida law, "when there is a valid contract governing the dispute, a plaintiff cannot recover under a contract implied by law—instead, the express contract governs." *AECOM Tech. Servs., Inc. v. Pro. Servs. Indus., Inc.*, 580 F. Supp. 3d 1176, 1194 (M.D. Fla. 2021) (citing *Agritrade, LP v. Quercia*, 253 So. 3d 28, 34

(Fla. 3d DCA 2017)).  Here, neither party has argued that the Services Agreement is void or unenforceable.  Instead, a valid, express contract squarely governs the circumstances under which plaintiff owns material produced by Therapy LLC, or the circumstances in which Therapy LLC must license its pre-existing materials to plaintiff.  Therefore, plaintiff cannot recover under an implied contract theory as a matter of law, and defendants are entitled to summary judgment on plaintiff's unjust enrichment claim as well.  *Id.*

### C.  Claims for Specific Performance and Injunctive Relief (Counts III, V)

Finally, specific performance and injunctive relief are available as remedies to breach of contract.  However, because the court finds that neither Dr. Schils nor Therapy LLC breached their contracts with plaintiff, specific performance and injunctive relief are not available here, at least under the current record before the court.  Thus, defendants are also entitled to summary judgment as to these claims.

## III. Therapy LLC and Dr. Schils' Counterclaim against Cono for Breach of Contract (Count I)

Defendants also move for summary judgment as to Count I of their counterclaims for breach of the Services Agreement based on plaintiff's failure to:  (1) pay the Consulting Fee due under Section 3.2; (2) pay the Revenue Share required under Section 3.3; and (3) provide four FES systems under Section 4.2.  The court addresses each of these subclaims in turn below.

### A.  Consulting Fees

Defendants argue that plaintiff materially breached the Services Agreement in

November 2024 by ceasing payment of the monthly consulting fee as called for under the Agreement.  Under Florida law, if a party substantially performs under the contract, it is not in material breach and may recover the benefit of its bargain.  *Hibachi Grill, Inc. v. Arki Const., Inc.*, 138 So. 3d 576, 578 (Fla. 3d DCA 2014).  Similarly, if a party fails to pay its obligations under a contract despite the other party substantially performing, that party has materially breached the contract.  *Star2Star Commun., LLC v. AMG Group of Brunswick, LLC*, 2021 WL 4442668, at *3 (M.D. Fla. 2021), *aff'd*, 2022 WL 1157776 (11th Cir. 2022).

Here, plaintiff admits that it stopped paying the Consulting Fee to Therapy LLC starting in November 2024, despite it providing consulting services to plaintiff until then.  Worse, the parties agree that the total, initial consulting fee of $500,000 was "deemed earned" under the Services Agreement at the time of closing, payable to Therapy LLC, even in the event of Dr. Schils' death or incapacitation.  (Dkt. #6-2, at § 3.2.)  Thus, defendants contend that plaintiff materially breached their Agreement.

In response, plaintiff argues that its admitted nonperformance was excused because of defendants' material breach of the Services Agreement by refusing to transfer unredacted therapy cards.  The court has already concluded that defendants had no such obligation, however, and plaintiff offers no additional factual or legal basis justifying its nonperformance.  Moreover, since this was plaintiff's *sole* argument for its nonperformance, the court could simply grant summary judgment to defendants on that basis alone.  *See Caruso*, 197 F.3d at 1197 (7th Cir. 2003) (a party opposing summary judgment waives any argument not raised in its response brief); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d

378, 389 (7th Cir. 2012) (a party opposing summary judgment forfeits reliance on evidence not cited in its response).

Even considering the entirety of the record, which the court is not obligated to do, plaintiff's other suggested reasons for stopping consulting payments are inadequate. First, plaintiff argues Dr. Schils was obligated to demonstrate that her recorded consulting hours rendered a measurable benefit to Cono, but no such obligation is spelled out in the Agreement, nor could a jury find defendants were acting without good faith on this record. Second, plaintiff suggests Dr. Schils wrongfully retained access to an EquiNew email address and bank account, which constituted a separate, material breach justifying its nonpayment. However, the only evidence to this effect lies in conclusory statements in Loiacono's declaration, which is nothing more than a "mere scintilla" of evidence insufficient by itself to permit a reasonable jury to find that Therapy LLC materially breached the agreement or failed to substantially perform in good faith, such that plaintiff's nonpayment of the consulting fee was justified. *Anderson*, 477 U.S. at 252. And again, even if such a defense were arguable, plaintiff *admits* that $500,000 in consulting fees were already "deemed earned" at closing, making any claimed after-the-fact excuse for non-payment for Therapy LLC's services immaterial up to that amount. As such, the court finds that there is no genuine dispute of material fact that plaintiff *did not* timely pay Therapy LLC the consulting fee due and owing under the Services Agreement, and such nonpayment constitutes a material breach of contract as a matter of law. Thus, defendants are entitled to summary judgment on this counterclaim for the monthly payments due to date.

### B. Revenue Share

Defendants similarly argue that there is no genuine dispute of material fact that plaintiff failed to pay the Revenue Share for 2024 called for under the Services Agreement, which would also amount to a breach of contract.  It is undisputed that plaintiff did not pay Therapy LLC the 2024 Revenue Share, and plaintiff's only possible justification for such nonpayment on the record is that defendants first materially breached the contract by refusing to transfer the unredacted therapy cards.  Because defendants did not materially breach the Services Agreement by refusing to transfer the therapy cards, plaintiff's nonpayment of the revenue share is a material breach of contract as a matter of law.  *Star2Star*, 2021 WL at *3.  Defendants are entitled to summary judgment on this aspect of their counterclaim as well in the amount of $14,583.33, which the parties agree is the prorated Revenue Share amount under the Agreement for 2024.

### C. FES Systems

Last, defendants claim plaintiff breached the Services Agreement by failing to provide the four FES systems due under the plain terms of Section 4.2 of the Servies Agreement, despite defendants having requested those systems but never receiving them. Again, plaintiff's only excuse for nonperformance is Therapy LLC's refusal to relinquish unredacted therapy cards, which is insufficient to support a breach.  Since plaintiff makes no other argument to justify its nonperformance under the Agreement, the court may stop there and grant summary judgment to defendants on this claim.  *Caruso*, 197 F.3d at 1197; *Milligan*, 686 F.3d at 389.

Nonetheless, plaintiff states elsewhere that it did not provide the FES systems to defendants because the manufacturer retained about 17 FES units, and plaintiff had requested from Dr. Schils a reconciliation as to the number of units in inventory shortly before filing this lawsuit. (Loiacono Decl. (dkt. #23) ¶ 14; Dkt. #23-5.) Defendants respond that plaintiff retains complete control over EquiNew's inventory, and that Dr. Schils has no access to the inventory records of the FES systems after the sale. Plaintiff neither offers facts in the record rebutting this assertion, at least after the sale of EquiNew, nor does it explain how a discrepancy in the number of units held by the manufacturer would entitle it to withhold the four units due Therapy LLC under the unambiguous Agreement. Thus, there is no genuine dispute of material fact that plaintiff breached the agreement by failing to provide these units. Defendants are entitled to summary judgment as a matter of law on this counterclaim, with the damages on this aspect of the breach to be determined at trial, and they are entitled to summary judgment on the entirety of the breach of contract claim in Count I of their counterclaims.

## ORDER

IT IS ORDERED that:

1) Plaintiff's motion for leave to file sur-reply (dkt. #30) is GRANTED.

2) Defendants' motion for summary judgment (dkt. #17) on plaintiff's claims of breach of contract (Counts I-V) is GRANTED.

3) Defendants-counterclaimants' motion for partial summary judgment (dkt. #17) on its claims of breach of contract (Count I) is GRANTED.

4) This case shall proceed to trial solely on the question of damages for Count I of defendants-counterclaimants' counterclaims, and the merits of defendants-counterclaimants' remaining counterclaims.

Entered this 6th day of January, 2026.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge